# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | | |
|---|---|---|
| DIRECTV, INC., a California corporation, | * * * | CIVIL NO. 4:03-CV-60292-TJS |
| Plaintiff, | * * | |
| v. | * * * | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER ON BENCH TRIAL** |
| JEFF BAKER, | * * | |
| Defendant. | * | |

## I. INTRODUCTION

A bench trial was held in this case on December 13 and 14, 2004. The plaintiff, DIRECTV, INC. ("DIRECTV"), is a broadcast satellite system which delivers television programming to households and businesses throughout the United States. The programming is offered to customers on a subscription and pay-per-view basis. DIRECTV encrypts its satellite transmissions to prevent unauthorized reception of its programming.

DIRECTV filed a Complaint (Clerk's No. 1) against Jeff Baker and several other defendants on May 21, 2003. DIRECTV alleges that Baker purchased and used devices designed to permit viewing of its programming without authorization by or payment to DIRECTV. (Complaint ¶ 3-4.) These devices are known as pirate access devices. *Id.* ¶ 3. Specifically in regard to Baker, DIRECTV contends that he purchased devices called "unloopers." *Id.* ¶ 13.

DIRECTV asserted three separate claims against Baker. Under Count I, DIRECTV alleges Baker has received and/or assisted others in receiving DIRECTV's satellite

transmissions of television programming without authorization in violation of 47 U.S.C. section 605(a). *Id.* ¶¶ 19-22.   Under Count II, DIRECTV alleges Baker intentionally intercepted, endeavored to intercept, or procured other persons to intercept or endeavor to intercept, DIRECTV's satellite transmissions in violation of 18 U.S.C. section 2511(1)(a). *Id.* ¶¶ 23-26.   Under Count III, DIRECTV alleges Baker possessed and used pirate access devices knowing, or having reason to know, that the design of the devices renders them primarily useful for the purpose of surreptitious interception of DIRECTV's satellite transmissions, in violation of 18 U.S.C. section 2512(1)(b). *Id.* ¶¶ 27-30.

In an order (Clerk's No. 90) filed on August 10, 2004, this court found that 18 U.S.C. section 2520(a) does not provide a private cause of action against persons who possess pirate access devices in violation of 18 U.S.C. section 2512(1)(b).   Consequently, the court dismissed Count III of the complaint for failure to state a claim upon which relief can be granted.

During the bench trial, testimony was submitted by Larry Rissler, who is a former employee and currently a consultant for DIRECTV, William Gatliff, who is an independent consultant specializing in the design and analysis of computerized devices known as embedded systems, and Jeff Baker. (*See* Clerk's No. 102, 103, 104.)

After the bench trial, the court granted DIRECTV's oral motion to amend the complaint to conform with the evidence pursuant to Federal Rule of Civil Procedure 15(b). (Clerk's No. 101.)  DIRECTV was allowed to include claims based on two earlier purchases of devices by Baker which were not raised in its initial complaint and add a claim for relief

pursuant to 47 U.S.C. section 605(e)(4).  The court took Baker's oral motions for judgment as a matter of law under consideration. *Id.*

As set forth below, this court finds Jeff Baker violated the statutory provisions of 47 U.S.C. section 605(a) and 18 U.S.C. section 2511(1)(a), but not 47 U.S.C. section 605(e)(4).

## II.  FINDINGS OF FACT

DIRECTV sells television programming to customers on a subscription and pay-per-view basis. (Trial Tr. p. 13.)  It uses satellites to retransmit programming it purchases from other sources to its customers. *Id.*  The satellite transmissions are encrypted, or electronically scrambled, to prevent unauthorized reception of the programming. *Id.* at 14.  In order to receive and view the programming, the customer needs certain receiving equipment, including a satellite dish, receiver, cable, remote control and an access card which is inserted into a slot in the receiver. *Id.* at 15-16.

The equipment can be ordered from DIRECTV or purchased at a retail outlet. *Id.* at 15.  Once the equipment is installed, the customer can subscribe to a programming package by contacting DIRECTV and identifying a 12-digit identification number on the access card. *Id.* at 17-18.  DIRECTV then sends an electronic message which activates a computer chip in the access card to allow the customer to view programming. *Id.* at 18-19.

In 1994, Larry Rissler created an office of signal integrity for DIRECTV to monitor public sources of information to determine if there were any threats to DIRECTV's encrypted satellite signal. *Id.* at 10.  The signal was compromised in late 1995 and Rissler conducted investigations of individuals who developed, trafficked, and used devices that allowed them to receive DIRECTV's programming without authorization by or payment to DIRECTV. *Id.*

These individuals, referred to as the "pirate community", developed technology to reprogram the computer chip in the access cards to allow receipt of all of DIRECTV's programming without authorization. *Id.* at 21. The pirate community sold the software and hardware devices that could reprogram the access cards on numerous web sites on the internet. *Id.* at 24.

DIRECTV began developing different access cards to replace the cards which had been compromised. *Id.* at 21-22. The initial access cards were replaced by a second generation of cards in 1996. *Id.* at 22. In 1997, DIRECTV discovered that the second generation of cards had also been compromised. *Id.* A third generation of cards was introduced in 1999 then found to be compromised in 2000. *Id.* at 23. DIRECTV subsequently developed a fourth generation of cards which, to DIRECTV's knowledge, has not been compromised. *Id.* at 23-24.

The specific devices used by the pirate community to reprogram the access cards are referred to as programmers and unloopers. *Id.* at 24-26; *see also* Ex. 48 (examples of hardware devices). Most of the devices have a slot for an access card to be inserted and the ability to be connected to a personal computer. *Id.* at 25. The pirate community also used a device referred to as a boot loader which was designed to overcome the effects of electronic countermeasures used by DIRECTV to inactivate reprogrammed access cards. *Id.* at 26-27; *see also* Ex. 47 (example of boot loader). Another device, referred to as an emulator, can also be used in conjunction with a programmer or unlooper to receive DIRECTV programming without authorization. *Id.* at 28, 120-22; *see also* Ex. 47 (example of emulator device).

DIRECTV created a national network of investigators to locate web sites that advertised the hardware devices, purchase the devices, and have them analyzed by DIRECTV's engineering department. *Id.* at 31.  In May 2001, DIRECTV began to conduct civil raids against locations that were trafficking the devices. *Id.*

One of the web sites investigated was called White Viper which was involved in manufacturing and selling various devices, including programmers and unloopers, designed to intercept DIRECTV's signal. *Id.* at 33-35; *see also* Ex. 35 (printout of pages from White Viper internet site).  The site also provided instructions and software to use with the devices. *Id.* at 34-35.  DIRECTV filed a lawsuit against White Viper and obtained a civil writ to seize the hardware devices. *Id.* at 35.  As a result of a settlement, DIRECTV obtained business records from the owner of White Viper, including sales documents and e-mail. *Id.* at 36-37.

DIRECTV also investigated a business called Vector Technologies, which also advertised and sold the hardware devices, and a business called Fulfillment Plus which shipped the devices for Vector Technologies. *Id.* at 37-39; *see also* Ex. 35 (printout of pages from Vector Technologies internet site).  DIRECTV executed a writ of seizure against Fulfilment Plus and obtained documents regarding Vector Technologies sales. *Id.* at 39, 42. Information in documents obtained by DIRECTV in these raids led to an investigation into Jeff Baker.

Baker had visited the White Viper web site to purchase a programmer and unlooper. *Id.* at 149.  He ordered the programmer by email on January 17, 2000. *Id.* at 47, 145; *see also* Ex. 20  p. 3 (copy of email).  He ordered the unlooper by email on November 6, 2000. *Id.* at 48, 145; *see also* Ex. 20 p. 4 (copy of email).  Both the programmer and unlooper purchased

by Baker are designed to facilitate the unauthorized interception of DIRECTV's broadcasts by allowing the user to modify a DIRECTV access card. *Id.* at 45-49, 116.

Baker had an active DIRECTV subscription from June 1997 to March 2000, during which time he purchased 67 pay per view movies, and paid an average subscription rate of approximately $64.84 per month. *Id.* at 51, 54; *see also* Ex. 22 (Baker's DIRECTV account records). In October 1999, Baker reduced his programming to the least expensive package available from DIRECTV. *Id.* at 53. There were no pay-per-view orders after January 1, 2000. *Id.* at 54. Baker suspended his subscription sometime in February or March 2000 and cancelled his account on November 21, 2000. *Id.* at 51; 235-37. He continued to possess DIRECTV equipment including a satellite dish and one or more receivers and access cards.

Baker was married in May of 1998. *Id.* at 231. Their first child was born on March 4, 2000, and spent nine days in intensive care. *Id.* at 232.

On May 18, 2001, Baker purchased two devices referred to as "MKII unlooper-WTX" from Syphontek, another web site which sold pirate access devices. *Id.* at 43-44, 77, 155-56; *see also* Ex. 15 (packing slip). The order was filled by Canadian Security and Technology and shipped by Fulfillment Plus. *Id.* Baker received the two devices shortly after ordering them. *Id.* at 155-56.

These devices were also designed to circumvent the security features of DIRECTV's access card system. *Id.* at 118-19; *see also* Exs. 40, 41 (Gatliff reports regarding MKII unlooper & WTX firmware). Baker acknowledges that the Syphontek website contained a warning against the illegal use of the devices. *Id.* at 156. He admits that he knew that the devices could be used to steal DIRECTV programming. *Id.*

Baker has a substantial knowledge of computers and electronics. *Id.* at 148, 151-53. In his words, he is "above average" in working with computers and has built 40 computers. *Id.* at 151.  He has also researched and experimented with smart cards. *Id.* at 152.  DIRECTV access cards are a type of smart card. *Id.*

Baker is in the business, as a sideline, of buying, reconditioning, and reselling electronic devices and parts such as pinball machines on e-Bay. *Id.* at 151; 206-15; *see also* Ex. 28 (Baker's PayPal records).  Baker claims that he purchased the unloopers to flash or program EPROM chips used in pinball machines. *Id.* at 147-48; 271.  According to Baker, his repeated attempts to flash or program the EPROM chips did not work. *Id.* at 147-49; 271. He claims he bought the programmer in January 2000 because he was interested in smart card technology and used the device to put information on smart cards. *Id.* at 167-68.

Baker also purchased, upgraded, and resold satellite receivers, including TiVos, on e-Bay. *Id.* at 215-19.  Some of the receivers he purchased came with access cards. *Id.* at 217. He also purchased and resold DIRECTV access cards, separate from the receivers, at a higher price than DIRECTV charges its customers for cards. *Id.* at 60-64, 246-47; *see also* Ex. 28 (Baker's PayPal records).

## III.  CONCLUSIONS OF LAW

DIRECTV seeks damages against Jeff Baker for violations of the Federal Communications Act, 47 U.S.C. sections 605(a) and 605(e)(4) and the Electronic Communications Privacy Act, 18 U.S.C. section 2511.  Both 47 U.S.C. section 605(a) and 18 U.S.C. section 2511 address the unauthorized interception of electronic communications.

47 U.S.C. section 605(e)(4) relates to trafficking in devices that facilitate such unauthorized

interceptions.

## A.  Statutory Provisions

47 U.S.C. section 605(a) provides, in part, as follows:

> Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpoena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority.  No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person.  *No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.*  No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. § 605(a)(emphasis added).  DIRECTV relies upon the emphasized statutory

language as the basis for its claim against Baker.[1]

---

[1]     Although not an issue raised by the parties, the court notes that "radio communications" in section 605(a) has been construed to include satellite transmissions. *See Cable/Home Communication Corp. v. Network Productions, Inc.*, 902 F.2d 829, 847 (11th Cir. 1990)(citing 47 U.S.C. § 153(b); *ON/TV of Chicago v. Julien*, 763 F.2d 839, 842 (7th Cir. 1985)).

Section 605(e)(4) provides as follows:

Any person who manufactures, assembles, modifies, imports, exports, sells, or distributes any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or direct-to-home satellite services, or is intended for any other activity prohibited by subsection (a) of this section, shall be fined not more than $500,000 for each violation, or imprisoned not more than 5 years for each violation, or both. For purposes of all penalties and remedies established for violations of this paragraph, the prohibited activity established herein as it applies to each such device shall be deemed a separate violation.

47 U.S.C. § 605(e)(4).   DIRECTV may bring a civil action, as an aggrieved party, for violations of subsections (a) and (e) (4) pursuant to 47 U.S.C. section 605(e)(3)(A).

18 U.S.C. section 2511(1) provides, in part, as follows:

Except as otherwise specifically provided in this chapter any person who –

(a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;

* * *

shall be punished as provided in subsection (4) or shall be subject to suit [by the Federal Government] as provided in subsection (5).

18 U.S.C. § 2511(1).   DIRECTV has a private cause of action for violations of section 2511(1)(a) pursuant to section 2520(a), which provides as follows:

(a) In general.– Except as provided in section 2511(2)(a)(ii), any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity, other than the United States, which engaged in that violation such relief as may be appropriate.

18 U.S.C. § 2520(a).

## B.  Application of Facts

The primary issue raised in this case is whether Baker intercepted or received DIRECTV's signal without payment to, or authorization from, DIRECTV.  Baker claims that, while he admittedly purchased the programmer and unloopers, he never used or attempted to use the devices for any illegal means and never stole any signal or programming from DIRECTV.  Baker points out there was no testimony from any individual who witnessed him either using the devices to modify an access card or to receive or intercept DIRECTV's signal.  He also notes that there is no documentary or electronic evidence that directly shows that he used the programmer and unloopers as pirate access devices.

This court finds, however, that DIRECTV proved by a preponderance of the evidence that Baker used the devices to intentionally intercept and/or endeavor to intercept, and to receive for his own benefit, DIRECTV's satellite programing without authorization by or payment to DIRECTV.  The evidence establishes that Baker purchased four devices designed and used for satellite television piracy and had other necessary equipment and knowledge to use the devices to steal DIRECTV's programming.  The court is also persuaded by the fact that Baker reduced his use of and ultimately cancelled his subscription to DIRECTV around the time he purchase the pirate access devices.

Although DIRECTV relies upon circumstantial evidence, such evidence is sufficient to establish its claims. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003)("'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'"; quoted citation omitted.)

As to Baker's various explanations in response to the evidence, the court finds much of his testimony lacks credibility.  For example, his claim that he canceled his subscription to DIRECTV in November 2000, because he was being overcharged and eventually found a "better deal" with Dish Network, is suspect at best. (*See* Trial Tr. pp. 157-60.)  The overcharges he referred to occurred in June 1997 and September 1998. *Id.* at 230.  Other than his personal testimony, Baker submitted no other evidence showing that he subscribed to Dish Network programming during the relevant time periods.

The court also rejects Baker's explanation that he was attempting to program EPROM chips with the unloopers.  The testimony of William Gatliff establishes that Baker's claimed use for the unloopers was not plausible and that someone with Baker's knowledge of and experience with electronics would have known it was not plausible.  In addition, Baker did not present any evidence other than his personal testimony that he purchased pinball parts prior to August 2003. *Id.* at 246.

Although the court finds Baker's testimony regarding his family situation and claimed impact on his television viewing and family expenses to be plausible, the court finds it is insufficient to overcome the evidence which supports DIRECTV's claims and the lack of credibility as to his other explanations.  The court notes that Baker's overall credibility was diminished significantly by his failure to disclose his purchases from White Viper in 2000 in response to DIRECTV's discovery requests or during his deposition. *See id.* at 141-45.  Contrary to Baker's claim, the discovery requests were clearly plain enough that Baker should have disclosed his purchases in 2000.

Based on the facts presented during the bench trial, this court concludes that Baker violated 47 U.S.C. section 605(a) and 18 U.S.C. section 2511(1)(a).

The court does not believe, however, that DIRECTV has proved that Baker violated 47 U.S.C. section 605(e)(4).  Although Baker admittedly sold access cards, DIRECTV has failed to prove, by a preponderance of the evidence, that the access cards he sold had been modified or were intended to assist the unauthorized decryption of its satellite programing. In light of the way items are sold on e-Bay as an auction, the court is not persuaded by the fact that Baker was able to sell access cards at a price higher than DIRECTV sells the cards. Nor is the court convinced that the language Baker used on e-Bay to sale the access cards shows that they were either modified or intended to be used to steal DIRECTV's signal.

## IV.  RELIEF

DIRECTV requests that the court award monetary damages, including punitive damages, injunctive relief, and its attorneys' fees and costs.

## A.  Monetary Damages

47 U.S.C. section 605(e)(3)(c) provides as follows:

(I)  Damages awarded by any court under this section shall be computed, at the election of the aggrieved party, in accordance with either of the following subclauses;

> (I) the party aggrieved may recover the actual damages suffered by him as a result of the violation and any profits of the violator that are attributable to the violation which are not taken into account in computing the actual damages; in determining the violator's profits, the party aggrieved shall be required to prove only the violator's gross revenue, and the violator shall be required to prove his deductible expenses and the elements of profit attributable to factors other than the violation; or

(II) the party aggrieved may recover an award of
statutory damages for each violation of subsection (a) of this
section involved in the action in a sum of not less than $1,000 or
more than $10,000, as the court considers just, and for each
violation of paragraph (4) of this subsection involved in the
action an aggrieved party may recover statutory damages in a
sum not less than $10,000, or more than $100,000, as the court
considers just.

(ii) In any case in which the court finds that the violation was committed
willfully and for purposes of direct or indirect commercial advantage or private
financial gain, the court in its discretion may increase the award of damages,
whether actual or statutory, by an amount of not more than $100,000 for each
violation of subsection (a) of this section.

47 U.S.C. § 605(e)(3)(c).

Under this provision, DIRECTV requests the maximum statutory damages available

under subsection (i)(II) of $10,000 per device for a total of $40,000, plus an additional

amount under subsection (ii) for Baker's alleged "willful conduct."

18 U.S.C. section 2520(c) provides, in relevant part, as follows:

Computation of Damages.– (1) In an action under this section, if the conduct
in violation of this chapter is the private viewing of a private satellite video
communication that is not scrambled or encrypted . . . and the conduct is not
for a tortious or illegal purpose or for purposes of direct or indirect commercial
advantage or private commercial gain, then the court shall assess damages as
follows:

(A) If the person who engaged in that conduct has not
previously been enjoined under section 2511(5) and has not
been found liable in a prior civil action under this section, the
court shall assess the greater of the sum of actual damages
suffered by the plaintiff, or statutory damages of not less than
$50 and not more than $500.

(B) If, on one prior occasion, the person who engaged in that
conduct has been enjoined under section 2511(5) or has been
found liable in a civil action under this section, the court shall
assess the greater of the sum of actual damages suffered by the

-13-

plaintiff, or statutory damages of not less than $100 and not more than $1000.

(2) In any other action under this section, the court may assess as damages whichever is the greater of –

(A) the sum of actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or

(B) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000.

18 U.S.C. § 2520(c).

DIRECTV seeks damages under subsection (c)(2) and submits three alternative computations: (1) actual damages of $11,050 based on multiplying DIRECTV's average monthly subscription loss of $221 times 50 months for the time period Baker was able to obtain DIRECTV programming without paying for it; (2) statutory damages of $152,000 based on multiplying $100 times 1,520 days for the same time period; (3) and statutory damages of $40,000 based on multiplying $10,000 times four devices.  DIRECTV requests the court to assess the greater amount of $152,000.

The court notes, however, that the provisions under 47 U.S.C. section 605(e)(3)(C)(i)(II) and 18 U.S.C. section 2520(c)(2) do not mandate the award of the maximum or greater amount, but merely allows the court discretion to do so.  In addition, the court finds that the approximations for DIRECTV's monthly loss and the relevant time period are excessive under the facts of this case.  Even though the court is convinced that Baker intercepted DIRECTV's programming without authorization, there is insufficient evidence for the court to fairly approximate a time period he may have been doing so.  In this court's opinion, total damages in the amount of $5,000 under 47 U.S.C. section

605(e)(3)(C)(i)(II) and $5,000 under 18 U.S.C. section 2520(c)(2) is an appropriate and just amount under the circumstances of this case.

The court rejects DIRECTV's request for additional punitive damages under 47 U.S.C. section 605(e)(3)(C)(ii) and 18 U.S.C. section 2520(b)(2).

### B.  Injunctive Relief

The court finds DIRECTV is entitled to injunctive relief under the provisions of 47 U.S.C. section 605(e)(3)(B)(i) and 18 U.S.C. section 2520(b)(1).  DIRECTV shall submit a proposed order setting forth appropriate terms to prevent Baker from further statutory violations.

### C.  Attorney Fees and Costs

Pursuant to 47 U.S.C. section 605(e)(3)(B)(iii), the court "shall direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails." 18 U.S.C. section 2520(b)(3) allows for an award of "a reasonable attorney's fee and other litigation costs reasonably incurred."  Based on these statues, the court finds DIRECTV is entitled to its reasonable attorneys' fees and costs.

DIRECTV shall submit an application for its attorneys' fees and costs for the court's review.

### V.  CONCLUSION

Based on the evidence submitted during the bench trial, this court concludes Jeff Baker violated the statutory provisions of 47 U.S.C. section 605(a) and 18 U.S.C. section 2511(1)(a).  The court concludes that Baker did not violate 47 U.S.C. section 605(e)(4).

Baker's oral motions for judgment as a matter of law are denied.

Judgment shall be entered in favor of plaintiff DIRECTV, INC. and against defendant Jeff Baker for damages in the amount of $10,000, plus injunctive relief and reasonable attorneys' fees and costs to be ordered at a later date.

IT IS SO ORDERED.

Dated September 29, 2005.

_____
THOMAS J. SHIELDS
UNITED STATES MAGISTRATE JUDGE